IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : |
| | : CASE NO.: 1:12-CR-2 (WLS) |
| JOSEPH WILEY JORDAN, | : |
| Defendant. | : |

## ORDER

On June 8, 2012, a jury convicted Defendant Joseph Wiley Jordan on three counts of bank bribery and one count of conspiracy. The question this Order addresses is whether Jordan now owes restitution for that conviction. After jury trial, three hearings, and multiple stages of briefing, the Court finds the Government has failed to prove Jordan owes restitution by a preponderance of the evidence.

## PROCEDURAL and FACTUAL BACKGROUND

Before turning to the merits of the restitution question, it is worth recounting in some detail this case's history.

### A. *The Indictment*

The indictment in this case contained five counts. (Doc. 1.) Count One charged Jordan with conspiracy under 18 U.S.C. § 371. It alleged Jordan conspired with a Southwest Georgia Farm Credit lending officer named Larry Malone to bribe Malone with regard to bank business. The conspiracy count contained six overt acts:

> 5. On or about May 22, 2007, defendant Jordan paid Larry Malone the sum of $10,000.00
> 6. On or about October 11, 2007, defendant Jordan paid Larry Malone the sum of $7,500.
> 7. On or about October 26, 2007, Larry Malone made loan # 873620-03 with SWGFC funds, in the amount of 150,000.00, to defendant Jordan.
> 8. On or about October 26, 2007, defendant Jordan paid Larry Malone the sum of $25,000.00

1

> 9. On or about January 22, 2008, Larry Malone made loan # 873620-04 with SWGFC funds, in the amount of $200,250.00, to defendant Jordan.
> 10. On or about January 22, 2008, defendant Jordan paid Larry Malone the sum of $25,000.00.

(Doc. 1 at 3–4.)

Counts Two through Five corresponded with these overt acts. First, Count Two incorporated Paragraph 5. In other words, it alleged Jordan paid Malone $10,000 on May 22, 2007 to influence Malone with bank business, in violation of 18 U.S.C. § 215(a)(1). Counts Three through Five did the same. Count Three referenced Paragraph Six; Count Four, Paragraphs 7 and 8; and Count Five, Paragraphs 9-10.

### A. *The Trial Evidence*

After a three-day trial, a jury found Jordan guilty of Counts One, Three, Four, and Five. (Doc. 40.) It acquitted Jordan of Count Two. (*Id.*) The Government's basic theory at trial was that Jordan made four bribes to Malone to obtain SWGFC loans and referrals. (*See* Doc. 46 at 4–16; Doc. 45 at 106–09.) To prove its case, the Government introduced five witnesses: Richard Monson, SWGFC's CEO; Amanda Johnson, director of loan administration; Cynthia Strickland, director of credit risk underwriting; Tarrell Bennett, chief relationship manager; Larry Malone, former chief financial officer; and agent Steve McDermond of the Federal Bureau of Investigations. The Government also submitted twenty-six exhibits, primarily comprised of bank e-mails about paying Jordan referral fees, personal checks from Jordan to Malone; and portions of the loan agreements. (Doc. 38.)

The trial evidence showed Jordan began business with SWGFC sometime in January 2007. After Jordan, a well-connected, wealthy businessman in Southwest Georgia, referred several customers to the bank, SWGFC employees approached him with an offer. (Doc. 46 at 32, 39, 40.) If he continued to refer customers, the bank would

pay him a referral fee. (*Id.*) Based on this arrangement, the bank paid Jordan $36,500 from February to September 2007. (Doc. 38-1 at 10.)

Sometime in May 2007, chief lending officer Malone approached Jordan and suggested splitting the referral fees. (Doc. 45 at 28.) According to Malone, "[Jordan] had made referrals prior to [sic] without any commissions being paid, and I approached him about paying commissions to him and then splitting the commission in some way with me." (*Id.* at 30.) Apparently unbeknownst to Jordan, Malone had been receiving and soliciting money from a number of SWGFC borrowers. (Doc. 46 at 130–37.) In a different case, Malone pleaded guilty to crimes arising out of his corrupt conduct with other SWGFC customers. (Doc. 38-2 at 15–69.) This alleged conduct often included falsifying loan documents and issuing loans with nonexistent collateral. (*Id.*) As part of plea agreement, he agreed to testify in this case. (*Id.* at 38.)

Based on this purported fee-splitting arrangement, Jordan twice paid Malone a portion of his referral fees. (Doc. 38-1 at 31, 41.) On May 22, 2007, he endorsed a check to Malone for $10,000. (*Id.* at 31.) Then on October 11, 2007, Jordan gave Malone a $7,500 check. (*Id.* at 41.) Malone testified these payments were based on Jordan's referrals. (Doc. 46 at 28–31.) Therefore, the pair did not discuss how Malone would pay back Jordan. (*Id.* at 31.) The only explicit evidence on the purpose for these payments came from Malone.

After the May 22 payment, but before the October 11 payment, Jordan obtained three loans from SWGFC. (Doc. 46 at 34.) The first loan was a $100,000 line of credit for "operating expenses." (*Id.*) SWGFC approved this loan with a so-called fast credit loan application. (*Id.* at 43.) The fast credit application digests a customer's financial information and spits out a score. (*Id.* at 43, 90.) Employees do not independently analyze the borrower's finances. (*Id.*) Consistently with bank policy, the bank approved

3

the line of credit solely based on Jordan's fast-credit score. (*Id.* at 43.) Because the system is automated, Malone played no part in the approval beyond acting as the chief lending officer. (Doc. 45 at 5–6.)

About a month later, on July 31, 2007, Jordan's company, J. Wiley Jordan Investments II, obtained a $2.86 million loan from SWGFC. (Doc. 46 at 34.) According to Cynthia Strickland, the director of credit risk underwriting, the $2.86 million loan was fully underwritten. (Doc. 46 at 87.) In other words, SWGFC employees independently analyzed Jordan's finances, his assets and income, and his collateral. (*Id.* at 85–86; Docs. 39-3–39-12.) To secure the $2.86 million loan, Jordan offered two pieces of property. (Doc. 45 at 9; Doc. 39-11; Doc. 39-12.)  The first was a Turner County, Georgia warehouse, which was then leased to the Mars Incorporated, the candy company. Jordan apparently planned to use around $22,000 in monthly rent payments from Mars to pay down the loan. (Doc. 77 at 57.) Jordan also offered to secure the loan with a 420-acre farm in Calhoun County, Georgia. An independent appraiser valued these properties at $3.25 million and $1,176,000, respectively. (Docs. 39-11, 39-12.) Based on these conditions, a credit analyst recommended approval, as did Strickland and an executive review board. (Doc. 46 at 85–87.)

Then on September 27, 2007, Jordan borrowed $303,000 to purchase "non-agricultural real estate," a self-sufficient property whose income could purportedly pay the debt. (Doc. 46 at 34–35, 88–89.) This loan was secured in several ways. First, the bank took five Lee County, Georgia lots and a second lien on a Dougherty County, Georgia lot as collateral. (Doc. 39-14 at 26.) The loan was also cross-collateralized with the properties on the July 31, 2007 loan. (*Id.*) Nevertheless, Strickland testified the bank did not verify the real estate's income. But at the same time, she testified they could have requested such information and apparently did not. (*Id.* at 88–89.) Once again, a

4

credit analyst independent of Malone and an executive board approved the loan. (*Id.* at 88; Docs. 39-14; 39-16.)

In late October 2007, the form of payments between Jordan and Malone changed. Once a so-called referral splitting arrangement, now the payments became loans Malone planned to repay, he said. (Doc. 45 at 33–37.) On October 26, 2007, Jordan paid Malone $25,000. (Doc. 38-1 at 35.) Before that, on the same day, Jordan received a $150,000 extension on his line of credit. (Doc. 46 at 89–90.) This extension derived from the same process as the $100,000 loan—an automated system that spit out a score. (*Id.*) The bank did not obtain new information on that loan because of the proximity between the $100,000 and $150,000 lines of credit. (*Id.*)

Jordan obtained his last loan from SWGFC on January 22, 2008, in the amount of $200,250. Jordan sought this loan after receiving a notice of an unpaid $156,616.63 balance from the IRS. Jordan gave the notice to Malone, who gave it to Strickland, to begin the loan process. (Doc. 38-1 at 30.) In addition to paying his federal taxes, Jordan requested $25,000 for Georgia taxes. (*Id.*) Strickland testified that the bank did not verify the $25,000 request. (Doc. 46 at 81–82.) Malone testified that $25,000 of the loan was for him. (Doc. 45 at 38.) On the other hand, Jordan submitted evidence that he paid $24,000 or $29,000 in Georgia taxes that month. Furthermore, although Strickland testified that the loan was not fully underwritten, a memo on the loan, signed with what appears to be a "CS," noted that "[d]ue to the short term [sic] mature of the loan request the ACA did not collect current financial statements or conduct a complete credit analysis for the request." (Doc. 39-19 at 76.)

On January 22, 2008, Jordan also made a $25,000 payment to Malone. "At some point," Malone said, "and I don't remember specifically what point—it could have been the first $25,000. It could have been the second $25,000, but Wiley [Jordan] had

5

proposed that if I would assist him in future transactions involving real estate—either via loan structure or what-not—that we would just work out the details then and not pay it back." (Doc. 45 at 37.)

### B. *The Presentence Investigation Report*

After the jury's verdict, the Court scheduled a sentencing hearing for December 13, 2012. (Doc. 57.) About two months before the hearing, on October 12, 2012, a United States Probation Officer prepared a draft Presentence Investigation Report. (Doc. 51.) It is the Probation Office's practice to file "draft" PSRs before sentencing hearings so that parties have notice and opportunity to object.

The draft PSR contained several paragraphs relevant to this Order. First, it explained that Jordan defaulted on his loans with SWGFC. (Doc. 51 ¶ 5.) These loans were cross-collateralized with several pieces of property, together valued at $3,316,000 in summer 2010. In a "global settlement," Jordan deeded these properties to SWGFC, which, according to the settlement, satisfied his obligations to the bank. (Doc. 51 ¶¶ 5, 6.) Because the properties' appraised values exceeded the outstanding principal, the PSR concluded SWGFC did not suffer loss with respect to Jordan's loans. (*Id.* ¶ 7.) Accordingly, it found that Jordan did not owe restitution. (*Id.*)

In addition, the Probation Officer calculated the offense level at 24. (*Id.* ¶ 19.) He reached that level by applying United States Sentencing Guideline § 2B4.1. (*Id.* ¶ 13.) The Probation Officer first found that the base offense level was 8. (*Id.*) He then added 6 points under § 2B1.1(b)(1) because Jordan gave more than $30,000 in bribes but less than $70,000. (*Id.* ¶ 14.) The Probation Officer used the value of the bribes, rather than the improper benefit conferred, because Jordan fully qualified for the loans and secured them with collateral. If all of his loans were labeled as improper benefits, §2B1.1 would have required an additional 18 points, bringing his offense level to 26, without the gross-

6

receipts enhancement. *See* U.S.S.G §§ 2B1.1, 2B4.1. Instead, the Probation Officer increased the offense level to 24 because Jordan derived more than $1 million in gross receipts, requiring a level of at least 24. (Doc. 51 ¶ 15.)

A period for objections followed the issuance of the draft. Jordan filed a lengthy objection. (Doc. 52.) Among other arguments, he contended he did not derive more than $1 million in benefits because the $2.86 million loan—the only loan pushing him above the million-dollar threshold—was not derived from the alleged offenses. (*Id.* at 5.) Furthermore, Jordan disputed that the bank issued any of the loans because of those payments, arguing that the loans did not involve fraud. (*Id.* at 2.)

The Government did not respond to the draft PSR. (*See* Docket.) Instead, several days after the final PSR, and the day before the next morning's sentencing hearing, the Government filed a sentencing memorandum that made confused, contradictory arguments. (Doc. 55.) First, it said, "[t]he Sentencing Guidelines have been correctly calculated by the United States Probation Office." (*Id.* at 1.) It added, "[a]s set forth in Paras. 14 and 15, if the defendant derived more than $1,000,000 in gross receipts from the financial institution as a result of the offenses, the offense level is increased to level 24." (*Id.*) The memo then relied heavily on *United States v. Benner*, 442 F. App'x 417 (11th Cir. 2001), for the proposition that the value of the loans, and not the amount of the bribes, should be used to calculate the sentencing guidelines under §2B4.1(b)(1). (*Id.* at 2–3.) In conclusion, the Government "submit[ed] that the defendant be sentenced within the Guideline range as calculated in the presentence report." (*Id.* at 4.) But the final PSR, like the draft, used the value of the bribes, not the loans. (*See* Doc. 53 ¶ 14.)

### C. *The First Sentencing Hearing*

On December 13, 2012, the Parties appeared for a sentencing hearing. (Doc. 57.) That morning, for the first time, counsel for the Government informed the Court and

7

Jordan's counsel he wanted restitution. He admitted he had not filed an objection to the draft or final PSR. Counsel for Jordan objected to the Government's request as untimely. But because of the mandatory nature of restitution, the Court continued the sentencing hearing to allow the Parties to brief the issue of restitution and prepare for a restitution hearing.

The Court moved the sentencing and restitution hearing to January 30, 2013. In the meantime, the Parties filed briefs addressing whether Jordan owed restitution. (Doc. 56, 59.) This turned out to be a complicated question. The Mandatory Victims Restitution Act of 1996 requires a court to subtract the "value (as of the date the property is returned) of any part of the property that is returned" from any restitution award. 18 U.S.C. § 3663A(b)(1). But if the loss is a loan secured by real property collateral, when should a court calculate the return of the property—at the time the victim takes title to the collateral or when it recoups the money during a sale? This question has resulted in a split in the Courts of Appeals. *Compare United States v. Robers*, 698 F.3d 937, 955 (7th Cir. 2012) ("Because cash was stolen and cash was not returned to the victims until the collateral securing the fraudulent loans was sold, under the plain language of the MVRA the value of the property returned on the date of its return is the amount of cash recovered at the time the foreclosed real estate was eventually resold."), *with United States v. Yeung*, 672 F.3d 594, 601 (9th Cir. 2012) ("To calculate the value of the real property collateral 'as of the date the property is returned,' . . . courts use the value of the property 'as of the date the victim took control of the property' . . . ."). Here, the answer to that question was critical because SWGFC sold the property for half of its appraised value. And because the Court could not find binding Eleventh Circuit precedent and neither Party had cited any cases from the Circuit split, the Court entered an Order directing the Parties to a few of the cases and asking them to

8

discuss them during the hearing. (Doc. 61.) The Court also allowed, but did not require, the Parties to file supplemental briefs. (*Id.*)

Afterward, the Parties informed the Court via e-mail they needed additional time to address the Circuit split. But they proposed that the Court proceed to sentence Jordan, leaving the restitution issue for later determination. Once again, the Court agreed to continue the issue of restitution. (Doc. 63.) The Court entered an Order giving the Parties a month to file supplemental briefs and setting the restitution hearing for March 6, 2013. (*Id.*)

### D. *The Second Sentencing Hearing and First Restitution Hearing*

As scheduled, the Parties appeared for the scheduled sentencing hearing. (Doc. 64.) Whenever a defendant objects to a guidelines enhancement, the Government bears the burden of establishing it applies by a preponderance of the evidence. With that in mind, the Court began the sentencing hearing by asking the Parties to address whether the $1 million sentencing enhancement applied and whether the $2.86 million loan was part of the offense conduct. (Doc. 77 at 3–8.) This was, after all, a major point of contention at trial and one of Jordan's principal objections.

The Court then heard argument on whether the $2.86 million loan was derived as a result of the offense. The Parties acknowledged this question was closely related to the overall amount of restitution. (*Id.* at 29, 32.) Defense counsel reiterated his point from the objection and argued there was no evidence linking the $2.86 million loan to the alleged offense conduct. (*Id.* at 8–12.) The Government asked the Court to infer the loan was part of the offense because of the conspiracy and surrounding circumstances. (*E.g. id.* at 15.) The Government claimed it was blindsided by the Court's questions, demanded a continuance, and told the Court to support its questions with case law. (*Id.* at 17, 23, 25–26.) Further, counsel for the Government attacked a straw man, claiming

9

that, by requiring a link between the gross receipts and the offense conduct, the Court was requiring a *quid pro quo.* (*Id.* at 12–13.)

The Court agreed to recess to allow the Government to refer back to the trial transcript in response to the Court's questions. (*Id.* at 33–34.) Before breaking, however, the Court heard evidence on restitution at the Parties' request. Once again, the Government was on notice of Jordan's argument that no loans resulted from the offense conduct. The Government produced one witness.

Richard Monson, SWGFC's CEO, testified Jordan was deficient on three loans. (*Id.* at 40.) First, Jordan had $158,546 in outstanding principal on a September 27, 2007 loan in the original amount of $303,000. Jordan also received on January 22, 2008, a $200,250 loan, on which he had $140,000 remaining. Finally, Monson testified that one of Jordan's companies received a $2.86 million loan on July 31, 2007. At the time of default, he owed $2,667,740 on that loan.

Monson also testified that SWGFC entered a settlement with Jordan regarding the outstanding balances on the loans. In lieu of foreclosure, Jordan deeded the collateral securing the $2.86 million loan to SWGFC. SWGFC referred to this transaction as a "global settlement," totally satisfying Jordan's financial liability to the bank. Specifically, Jordan deeded to SWGFC a 420-acre tract in Calhoun County, Georgia, and a warehouse in Turner County, Georgia. In June and July 2010, an independent appraiser paid by SWGFC valued the former properties at $840,000 and the latter at $2,296,000, totaling $3,136,000. On September 24 and November 9, 2010, SWGFC sold those properties for $420,000 and $700,000, respectively. According to Monson, these properties sold for less than their appraised value because of a bad economy and through no fault of SWGFC.

In any event, because of the drop in value, SWGFC lost $1, 846,286.56 from loans with Jordan. The bank included this loss in its claim to its insurer, The Farm Credit System Credit Association Captive Insurance Company. In total, SWGFC claimed about $25 million to the insurance company from losses related to Larry Malone. Although the insurance company agreed to cover the entire $1,846,286.56 loss related to Jordan, it did not cover all of the losses associated with Larry Malone and other customers not involved in this case. The insurance company and SWGFC eventually entered a settlement for $14.7 million, leaving SWGFC all rights to any future restitution and collateral.

Jordan introduced the testimony of Will Sims, a friend and banking consultant. (*Id.* at 57.) Sims testified Jordan defaulted on the $2.86 million loan when Mars decided not to renew its lease at the warehouse, depriving Jordan of thousands of dollars in income he used to pay the SWGFC loans. Sims and Jordan unsuccessfully tried to secure a new tenant.

After Sims's testimony, the Court asked the Parties whether they had additional witnesses. (*Id.* at 65.) Counsel for the Government said no; counsel for Jordan said no. (*Id.*) The Court then advised the Parties it would "close the evidence and postpone any further argument at this time on the issue of restitution." (*Id.*)

After a recess, the Court reconvened in the afternoon to hear further argument on the gross-receipts enhancement. The Government began. It argued that several pieces of evidence from trial supported the enhancement. First, it claimed that Jordan had written a $10,000 check to Larry Malone. It also emphasized the jury's guilty verdict on conspiracy, which the Government alleged began in May 22, 2007, before the $2.86 million loan. (*Id.* at 71.) Therefore, per the Government, the loan grew out of the conspiracy. Additionally, the Government identified several quotes from Malone's

11

testimony, where he admitted he and Jordan did not disclose any of Jordan's payments to Malone, that he and Jordan had a "good ol' boy" system, among other things. (*Id.* at 77–80.) Defendant maintained the Government was relying on theory and conjecture and there was no evidence establishing that the $2.86 million loan was obtained as a part of the offenses. (*Id.* at 82.)

Based on the arguments and independent reviews of the record, the Court found the Government had not established the gross-receipts enhancement by a preponderance of the evidence. (*Id.* at 90.) But then, after the Court hours spent addressing the gross-receipts enhancement, Government contended, for the first time ever, that the Presentence Investigation Report was incorrect and required the Court to calculate the improper benefit as the entire principal amount of the loans, under §2B4.1(b)(1).[1] (*Id.* at 96.) As mentioned *supra*, the Government's position would have elevated the offense level to at least 26. The Court rejected this argument because Jordan qualified for his loans and fully secured them and for other reasons stated by the Court at the hearing.

### E. The Second Restitution Hearing

After the second sentencing hearing, the Parties had more than thirty days to file supplemental briefs on the question of restitution. By March 1, 2013, the Parties filed their briefs. (Doc. 79.) Jordan's brief argued the Court need not reach the Circuit split because he did not owe restitution if the Court found the $2.86 million loan did not result from the offense conduct. (Doc. 78.) The Government's brief, despite the Court's Order, failed to address the Circuit split and claimed, without citation to evidence in the

---

[1] Regarding the delay in bringing this argument, the Government made two arguments. First, it claimed that it did not bring this objection because it defaulted to the probation office's higher calculation under the gross-receipts enhancement. As mentioned *supra*, however, had the probation department calculated the offense level in this way, Jordan's offense level would have been higher, with or without the gross-receipts enhancement. Moreover, the Government claimed it raised this issue in its sentencing memorandum. This position was not reflected in the record. The Government undisputedly requested that the Court sentence Jordan at the guideline range calculated by the probation department.

12

record, that Jordan would not have obtained any of the loans without bribery. (Doc. 79.) The Government added it would prove restitution during the hearing. (*Id.* at 2.)

The Parties appeared March 6, 2013. At the hearing's outset, the Parties argued about whether the Government was entitled to introduce more evidence on restitution. Jordan maintained the Court had closed the evidence in the second hearing. On the other hand, the Government was certain the Court did not. After reviewing the last sentencing transcript, the Court found that it had, in fact, unequivocally closed the evidence on restitution.

The Parties began oral argument. Jordan maintained there was no evidence establishing that $2.86 million was a result of the offenses. The Government relied heavily on the trial testimony of Cynthia Strickland, who reviewed many of Larry Malone's recommendations. The Court asked the Government about its position on the Circuit split. The Government responded that it would leave that issue to the Court's discretion, even though the Court had continued a finding on restitution to give the Parties a chance to address that very question.

## **DISCUSSION**

The question this Order addresses is whether Jordan owes restitution under the Mandatory Victims Restitution Act. Because that turned out to be a complex question, the Court gave the Parties several opportunities to brief or provide evidence. Mark Twain once said he "was seldom able to see an opportunity until it had ceased to be one." Perhaps the Government never saw its opportunity, either. Having missed it, however, the Government decides the result in this case.

The Court finds Jordan does not owe restitution. Under the Mandatory Victim Restitution Act, a sentencing court must impose restitution when a "victim" suffers a pecuniary loss. 18 U.S.C. § 3663A(c)(1)(B). The MVRA defines "victim," as follows:

> [T]he term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

§ 3663A(a)(2). It is not true, as the Government has maintained, that the mere existence of a crime or conspiracy is enough to prove restitution. Restitution need not arise solely from offense conduct, but "a criminal defendant cannot be compelled to pay restitution for conduct committed outside of the scheme, conspiracy, or pattern of criminal behavior underlying the offense conduct." *United States v. Valladares*, 544 F.3d 1257, 1269–70 (11th Cir. 2008) (quoting *United States v. Dickerson*, 370 F.3d 1330, 1341 (11th Cir. 2004)). In other words, a "restitution award 'must be based on the amount of loss *actually* caused by defendant's conduct.'" *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010) (quoting *United States v. Liss*, 265 F.3d 1220, 1231 (11th Cir. 2001)). *See also United States v. Singletary*, 649 F.3d 1212, 1221 (11th Cir. 2011) ("The Government had the burden of proving, with respect to each of the mortgages for which it sought restitution, that the mortgage was the product of a fraudulent misrepresentation.").

When restitution is disputed, the Government is required to prove it by a preponderance of the evidence. *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997). The Government claims that Jordan owes restitution on the following three loans: the July 31, 2007 loan, the September 27, 2007 loan, and the January 22, 2008 loan. The Government and SWGFC claim deficiencies in the amounts of $1,547,740.47, $158,546.09, and $140,000 on those loans, respectively. The Government had a chance to provide evidence or argument on that position in an objection to the draft PSR, at the second sentencing hearing, in its supplemental brief, and at the March 6 hearing. Nevertheless, the Government introduced one witness, one exhibit, and otherwise relied entirely on the trial transcript. The Court has pored over these things and finds them

14

wanting. The Government has failed to show, by a preponderance of the evidence, that Jordan *caused* the SWGFC's losses.

Turning first to the trial transcript, the Court finds it fails to show Jordan owes restitution. Unlike your everyday, run-of-the-mill bank bribery or fraud, where the defendant would not otherwise qualify for the loan or its conditions, SWGFC approved Jordan's loans at several levels on accurate financial information. The trial evidence, in fact, suggests SWGFC was eager for Jordan's business and connections. He and his son had a preexisting relationship with SWGFC before Malone approached him for payments.

There was little, if any, evidence that Jordan received loans he did not qualify for or obtained them on more favorable terms and conditions. Actually, this was one of Jordan's primary defenses. Jordan introduced thousands of pages of loan documents and asked several witnesses about the propriety of those documents. The Government, on the other hand, primarily offered generalities and unsupported theories.

To illustrate, one of the main witnesses the Government has relied on during the sentencing phase was Cynthia Strickland. During direct examination, the Government solicited sweeping statements from Strickland about how many of Malone's loan applications were "pushed through" and not fully underwritten. (Doc. 46 at 80.) This turned out to be misleading. On cross-examination, Strickland admitted that Jordan's $2.86 million loan was fully underwritten, despite the suggestion to the contrary. (*Id.* at 87.) A credit analyst fully reviewed it, Strickland signed off on it, and an executive review board approved it. (*Id.*) In addition, an independent appraiser valued the collateral as eclipsing the loan principal. (Docs. 39-11; 39-12.) No one testified, and the Government did not seriously contend during trial, that there were misstatements or omissions in the loan application.

The October 11, 2007 loan for $303,000 underwent a similar process. SWGFC independently appraised five Lee County, Georgia lots and a Dougherty County, Georgia lot as collateral. (Doc. 39-14.) Additionally, Jordan and the bank cross-collateralized the real property collateral from the $2.86 million loan. (*Id.*; Doc. 45 at 14.) The loan documents reflect that a Dustin Day, a credit analyst, Tarrell Bennett, and an executive board approved the loan. Strickland testified they did not verify that the property was income generating, as Jordan claimed. (Doc. 46 at 88.) But she acknowledged she could have but probably never tried to get that information. (*Id.*)

More important, there was scant evidence linking the $10,000 or $7,500 payments to either of these loans. The Court is not saying, as the Government has maintained, that a *quid pro quo* must exist between the payments and the loans. But the offense or conspiracy must *actually* cause the losses. Here, the Government merely elicited evidence that neither Jordan nor Malone disclosed the payments. This may have been a conflict of interest for Malone, but no one testified Jordan broke any rules or fiduciary duties.

And Malone generally distinguished the $10,000 and $7,500 payments from the two $25,000 payments. These were part of the alleged referral-splitting scheme. Malone testified the $7,500 payment had no relationship to any of the loans. He testified:

> Q: So we're clear, that $7,500 check, you're testifying, had nothing to do with the $100,000 line of credit; right? The first line of credit, it had nothing to do with it?
> A: The original loan?
> Q: Yes, sir.
> A: No, sir.
> Q: And that $7,500 check, you're testifying, had nothing to do with the $2.86 million loan to J. Wiley Jordan Investments?
> A: Correct.

16

> Q: And it had nothing to do with—the $7,500 check had nothing to do with the $303,00 loan either. That was in the end of September of '07?
>
> A: Right.

(Doc. 45 at 33.) Malone's testimony is also consistent with the Government's theory of the case. During argument on Jordan's Rule 29 motion, the Government contended the referral-splitting arraignment was in itself bank bribery because the referrals were the bank's money. (Doc. 45 at 111.) The Government conceded that "as to Counts 2 and 3"—involving the $10,000 and $7,500 payments—"the Government can't and has not specified that the referral splitting related to this future transaction." (*Id.* at 116.) Finally, although the Government listed the last two loans as overt acts of the conspiracy, it did not list the $100,000, $2.86 million, or the $303,000 loans as overt acts. (*See* Doc. 1.) While the loans need not relate directly to a payment, they must be part of the general conspiracy. And the Government did not submit any evidence during trial that established those loans were part of it, despite the Government's allegation during sentencing that they were.

The $200,250 loan is a closer question. Admittedly, there was more evidence that part of this loan was the result of bribery. Jordan obtained this loan after giving Malone a notice from the IRS about $156,616.63 in unpaid taxes. (Doc. 38-1 at 30.) Malone gave this notice to Strickland with a handwritten note that Jordan also owed $25,000 to the state of Georgia. (*Id.*) Strickland testified SWGFC never verified the amount of $25,000 and the loan was not fully underwritten. (Doc. 46 at 81–82.)

On the other hand, people independent of Malone approved the loan, as did the executive review board. Further, although Strickland testified the bank did not fully underwrite this loan, a memo from the loan approval, signed with what appears to be "CS," explained that "[d]ue to the short term [sic] mature of the loan request the ACA

17

did not collect current financial statements or conduct a complete credit analysis for the request." (Doc. 39-19 at 76.)

The best evidence suggesting any of the loans were improper was Malone's testimony that Jordan planned to request an additional $25,000 of the $200,250 loan as a kickback. (Doc. 45 at 38.) But this evidence conflicted with other evidence from Malone that he made the comment on the IRS notice based on what he thought was accurate information. (*Id.* at 22–25.) Furthermore, Jordan submitted evidence that he did in fact pay $24,000 or $29,000 in Georgia taxes in January 2008. (*Id.*) In any event, even if the $25,000 of the $202,250 loan was obtained through bribery, the Court concludes that the global settlement—regardless of when you value the returned property—amply covers any amount obtained through bribery.

Finally, even after the probation officer recommended not granting restitution, Jordan unequivocally objected to restitution payments, and the Court asked for evidence on this and related issues, the Government still failed to submit sufficient evidence establishing a causal link. During the restitution hearing, the Government submitted the testimony of Richard Monson and a single exhibit describing the loan deficiencies and underlying collateral. But neither the testimony nor the exhibit made any comment about whether Jordan's conduct caused the bank to lose money. Both merely repeated what was obvious—that Jordan defaulted and the bank lost money as a result. Additionally, the Government's supplemental memorandum failed to cite a single piece of evidence to support its claim that Jordan's loan applications were "rife with fraud, false and misleading statements." (Doc. 79 at 6.) Instead, the Government, once again, relied on its general theories of the case.

On the other hand, the trial and restitution evidence established SWGFC sought Jordan's business for its own sake and for his professional connections. Even after the

18

bank fired Malone for misconduct, the bank continued to reprice Jordan's loans. (Doc. 46 at 97–98.) And it appeared that the cascading effect of a bad economy and Mars' decision to vacate Jordan's warehouse—where Jordan derived income for the payments on his $2.86 million loan—caused the defendant to default. Furthermore, this case is unlike Malone's other alleged corrupt dealings, where he allegedly falsified collateral and loan documents.[2]

In summary, the Court finds the Government has not satisfied its burden. It has not established the $2.86 million and $303,000 loans had any relationship to the offense conduct or a related conspiracy. To the extent any of the $202,250 loan resulted from bribery, the global settlement amply covers the loss, regardless of when the offset is calculated.

## **CONCLUSION**

Based on the foregoing, the Court finds that the Government has failed to establish Jordan owes restitution by a preponderance of the evidence. Accordingly, restitution is not ordered. The Court's findings in this Order in no way rebut the Court's finding on Defendant's Motion for Judgment of Acquittal. The relevant criminal law criminalizes Jordan's bribery payments, regardless of whether some of the loans fell outside of the criminal conduct or whether the bank would have issued them anyway.

**SO ORDERED**, this   29th   day of March 2013.

/s/ W. Louis Sands
**THE HONORABLE W. LOUIS SANDS,
UNITED STATES DISTRICT COURT**

---

[2] Because there was no evidence Jordan had a relationship with other alleged corrupt borrowers, the Court cannot impose restitution against Jordan based on the losses in those cases. Even if it could, the Government submitted no evidence on how much restitution it might seek in other cases related to Larry Malone.